Filed 1/7/25  In re R.K. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re R.K. et al., Persons Coming Under the Juvenile Court Law. | H052053 (Santa Cruz County Super. Ct. Nos. 22JU00162, 22JU00163) |
| SANTA CRUZ COUNTY HUMAN SERVICES DEPARTMENT, Plaintiff and Respondent, v. D.L. et al., Defendants and Appellants. | |

Appellants D.L. (Father)[1] and Ry.K. (Mother), parents of R.K. and N.K. (together, children), appeal from orders terminating their parental rights as to both children.  Father and Mother are an intact couple who have a history of substance abuse.  Appellants separately contend the juvenile court erred in refusing to apply the beneficial parental relationship exception.  (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)[2]  Respondent Santa Cruz County Human Services Department (the Department) disagrees the parents established that the children would benefit from continuing their relationship with the parents and that termination of the relationship would be detrimental to the children.

---

[1] D.L. was found to be the presumed Father of both children at the detention hearing.  There is no question as to paternity.

[2] Unspecified statutory references are to the Welfare and Institutions Code.

Although we recognize the extent of the parents' affection for R.K. and N.K., we conclude that the juvenile court based its decision on substantial evidence and a proper application of the law to that evidence. For the reasons explained here, we affirm the juvenile court's order.

## I. FACTS AND PROCEDURAL BACKGROUND[3]

Mother gave birth to R.K. in June 2021 and N.K. in September 2022. Both children were exposed to methamphetamine and other illegal substances at birth. In 2021, the Department received a referral of general neglect of R.K. after he was diagnosed with a failure to thrive. The outcome of the referral was inconclusive because the Department was unable to locate the family. A couple weeks prior to N.K.'s birth, the Department received another referral of general neglect of R.K. after an anonymous source requested a welfare check at the family's parked minibus. Law enforcement was unable to locate the family but determined that the minibus was unsafe and uninhabitable.

At N.K.'s birth, the Department received the current referral indicating N.K. had tested positive for fentanyl and methamphetamine. N.K. was placed into protective custody, and Mother left the hospital against medical advice. Law enforcement then conducted a welfare check and located both parents and R.K. at their recreational vehicle. The officers did not believe Mother was under the influence or that there was any immediate threat of safety to R.K., so R.K. was not detained under a section 300 hold.

---

[3] Mother filed two prior related appeals: H050594 (appeal based on section 300 jurisdictional findings) and H051228 (appeal based on termination of reunification services for Mother). Both appeals were dismissed as abandoned because counsel for Mother filed a "no issue statement" and Mother did not submit a supplemental brief on her own behalf. (See *In re Phoenix H.* (2009) 47 Cal.4th 835.) In H051228, we took judicial notice of appeal number H050594. Father now requests we take judicial notice of the records from both prior appeals, and the Department adopts Father's suggested notations. We grant the request and take judicial notice of the records in both appeals. (See Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

A few days later, the Department filed a section 300 petition on behalf of R.K. and N.K. and requested that R.K. be detained. The Department alleged that the parents were in violation of section 300, subdivision (b), due to their substance abuse history, and section 300, subdivision (j), due to the abuse or neglect of the children's half-siblings. One half-sibling, Mother's biological child, was placed into protective custody due to Mother's substance use and released to the child's father, and the other half-sibling, Father's child, was adopted after Father failed to reunify. At the detention hearing, the court made prima facie findings on the petition and found that there was a substantial danger to the children's health, ordered the children detained in the temporary custody of the Department, and set a jurisdiction hearing. R.K. and N.K. were placed in a resource family home with their adopted older half-sibling.

A. *Visitation Between the Children and Their Parents*[4]

    1. <u>Both Parents Maintained Regular Visitation</u>

Both parents visited the children consistently throughout the dependency, but neither parent moved past supervised visitation. After the children's initial detention, both parents were afforded supervised visitation at a minimum of three times per week. Both parents consistently visited the children prior to the jurisdictional hearing. At the jurisdictional hearing, the court sustained the Department's section 300 petition, ordered the children removed from parental custody, and commenced reunification services for both parents. The parents' case plan required them to participate in counseling, parenting education, substance abuse testing, and a drug/alcohol assessment. The court advised the parents that, due to the children's young ages, there could be a termination of reunification services and an order to develop a permanent plan of adoption if there was not substantial compliance with the service plan within six months.

---

[4] Because the parents' appeals raise only the issue of the beneficial relationship exception, we omit many of the facts related to their individual progress in their reunification plans as not relevant to our disposition.

The court then set the six-month review hearing and maintained supervised visitation at a minimum of three times a week for one hour. Both parents attended their visits but had difficulty arriving on time because of factors such as bad weather that left them unhoused and without transportation or charged phones. At least one parent still attended 40 of the 48 scheduled visits during this period.

In its six-month reunification report, the Department, recognizing that both parents had shown some progress but that no drug tests had been completed, recommended that the children remain in the out-of-home placement and reunification services continue for the parents. The children's counsel contested the Department's recommendations but, highlighting the extenuating circumstances caused by the weather, requested a settlement conference to provide more time for the parents to demonstrate compliance with their plan. Prior to the settlement conference, Father visited with the children on a regular basis but missed a few visits. He suffered from a relapse but consistently engaged in services. Mother missed a handful of visits with the children, did not engage in any services, and did not complete any drug testing.

After an unsuccessful settlement conference and due to Father's continuing inability to address his substance abuse, the Department requested termination of family reunification services and asked that the matter be set for a permanency hearing. Father recognized that his relationship with Mother impacted his sobriety and ability to find stable housing, but he continued to be with her. Both parents visited the children prior to the contested six-month hearing. Father was consistently on-time to his visits with the children and made the effort to see them at their developmental assessments and therapy programs.[5] Mother was on time to her visits but missed an equivalent number, although she was at a detox program during a few missed visits.

---

[5] At an interim hearing, the court signed an order authorizing developmental assessments for both children because both parents had refused to sign the authorizations.

4

At the six-month contested hearing, which was continued a month to account for Father's compliance with his plan, the court noted the parents' struggles with sobriety and found that return of the children to the parents would create a substantial risk of detriment to the children's safety. The court found that Mother had made no progress towards mitigating the causes necessitating placement of the children in foster care and terminated her services, reducing supervised visits to once per month. But because Father was attempting to make progress and entered a residential substance abuse program the day of the hearing, the court granted him additional family reunification services and scheduled a 12-month review hearing. Father was still allowed three supervised visits a week.

From June to August 2023, Father was in his residential treatment program and was consistent and on-time to his visits with the children. In August 2023, the Department increased Father's visits to 1.5 hours and moved them to a park. Later that month, however, Father left his residential program due to a suicidal letter from Mother, and the couple began living in their car. The Department then moved Father's visits back to the county building and reduced them to one hour. In the weeks following his departure from the residential treatment program, Father was on-time to many of his visits but missed and cancelled an equivalent number. During this period, Mother cancelled and missed a few visits but was on-time to the majority of them.

By the time of the 12-month review hearing, the Department recommended termination of services for Father and requested that the court select a permanency plan under section 366.26. At the contested 12-month hearing, the court adopted the Department's recommendations and found that return of the children to the parents would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the children. The court emphasized that, under the law, the parents were required to make substantial progress in their case plan by six months due to the children's young ages, and the additional six months provided to the parents was an

exception.  However, Father missed 10 visits with his children, left his residential treatment after two months and stopped attending services and counseling, and was still testing positive for methamphetamine and fentanyl.  The court terminated reunification services for Father and set the matter for a selection and implementation hearing.  Mother and Father were afforded a minimum of one supervised visit per month prior to the section 366.26 hearing.

After the matter was set for a permanency hearing, visitation continued as it had throughout the dependency.  Father and Mother attended some supervised visits and missed others.

2.  Visitations with Both Parents Were Loving and Appropriate

The parents' visits with the children were positive and without significant incident, but the children increasingly sought out their resource parents for comfort over the course of the dependency.  During the supervised visits, both parents were attentive, brought age-appropriate snacks and books for the children, and played with the children.  At the 12-month review hearing, Father testified that his visits with the children were "[w]onderful" and "great," and that the children had a good time with him.  He explained that R.K. called him "daddy" and N.K. knew "I'm her daddy or somebody special to her."

However, the children's relationship with their parents did strain over time.  Prior to the six-month review hearing, a Court Appointed Special Advocate (CASA advocate) noted that R.K. "absolutely adore[d]" his resource parent and that N.K. only wanted to be held by her resource parent when getting ready for a nap.  A few months later, R.K.'s medical evaluation revealed that he had some attachment difficulties after visits with his biological parents.  For example, R.K. was distressed when his resource parent was not in front of him during visits and confused his resource parents with his biological parents.  Prior to the section 366.26 hearing, both children sought out their resource parent by the end of their visits with Father.  Mother had difficulty understanding R.K.'s speech, was

6

unsure how much N.K. could eat, and was nervous when the children would cry. N.K. also pointed towards the lobby and called out "mamma" towards the resource parent during multiple visits with Mother.

The parents' sobriety during the visits remained uncertain. Father and Mother nodded off a few times throughout the dependency. Prior to the contested six-month review hearing, Mother left her detox program and disrupted Father's visit by barging into the room and "upset[ting] the children and dad" to the extent that Father began to cry and had to step out for a few minutes to collect himself.

In its section 366.26 report, the Department described the parents' interactions with the children as "a close friend or extended family member." The Department wrote: "[w]hile the interactions appear to be positive, they do not rise to the level where there is significant emotional meaning and benefit to [R.K. and N.K.]. . . . [R.K. and N.K.'s] interactions with their parents do not reflect significant emotional bond to either parent." The Department determined that Mother's substance abuse use history and minimal behavioral changes interfered with her ability to safely parent her children and hindered any possible benefit with her children. Similarly, Father's history of substance abuse and choice to focus on his relationship with Mother rather than on his own recovery to reunify with his children also interfered with his ability to safely parent his children and hindered any possible beneficial relationship with his children.

The Department wrote that R.K. had spent more than half his life in the care of his resource parents and that N.K. had spent her entire life in the care of the resource parents. Both children had special needs and a history of in-utero drug exposure but had made significant progress in their development after being placed with their resource parents. Both children had developed secure relationships and strong parent-child bonds with their resource parents. They looked to their resource parents to meet their daily needs and provide them with security, stability, permanency, and well-being. The resource family was fully committed to meeting the children's needs and adopting R.K. and N.K. The

7

Department argued that, on balance, the harm of terminating the relationship with their parents was not outweighed by the security provided to both children by their resource family.

B. *Termination of Parental Rights*

In its report prepared in anticipation of the section 366.26 hearing, the Department recommended termination of parental rights and implementation of a plan of adoption with the children's resource parents. The parents contested the Department's recommendation and filed a section 388 petition, asking the court to vacate the section 366.26 hearing and extend reunification services for another six months. Mother informed the court that she had learned how to achieve stability in her sobriety, had been sober for three months, and believed she was a safe parent. She submitted documentation from her treatment facilities, sponsors and support network, and roommate. Father submitted paperwork indicating that he had been clean for 30 days. The court set a joint section 388 and section 366.26 hearing.

Both parents testified at the joint hearing. Father testified that his visits went great and that he loved seeing both children. R.K. always lit up as soon as Father came into the room, and N.K. was growing and developing well. Father testified that when R.K. first left his parents' care, he was "obviously traumatized" because he "went mute" and his "face would go blank" during goodbyes. This behavior went on for months, but R.K. eventually began talking again due to speech therapy and Father's reassurance that they would bring him home. When the court ordered reduced visits, N.K. also stopped wanting to sit on Father's lap, although she is a "daddy's girl", but Father believed that she had been doing better and seemed a lot happier after visitation increased. Father testified that he gave the children a lot of love and taught them how to have a good relationship. He fiercely contested the Department's characterization of his relationship with the children as a close friend or extended family member, testifying that the children

had emotional ties with their parents and that he was sure the resource parents could attest that the children acted out when they could not see their parents.

Mother testified that she had the opportunity to visit her children but did miss some visits. She stated that she read to and played with the children and that the children called her mama.

The court first decided the section 388 petition. While the court agreed with the Department's position that Father had not demonstrated changed circumstances required for a section 388 petition, it found Mother had demonstrated a change of circumstances by attending counseling, residential treatment, outpatient treatment. Still, the court found that a proposed change to the parents' care would not be in the best interest of the children as they were stable with their resource family. Therefore, the court denied that section 388 petition.

After taking evidence and hearing argument on the section 366.26 petition, the court adopted the Department's recommendations. The court noted the young ages of the children and found that two of the three elements required to establish the parental-benefit exception under *In re Caden* (2021) 11 Cal.5th 614 (*Caden C.*) were not met. The court stated: "this is not an easy case for a .26. One of the reasons that legislatures have decided that the timeline has to be so small for children under the age of three is how quickly they bond with the people that are giving them the parental role and giving them the love on a daily basis and meeting their needs on a daily basis because from birth to three those bonds are being created so much, so quickly, and so strongly. And it's very necessary for them to have this permanency and stability because those first three years set the foundation for their lives." It continued: "[Both children] have securely bonded and attached to their resource family. They have been observed seeking out [the resource mother] for both reassurance and emotional support during visits with their biological parents. Their interactions with their parents have been positive, but don't rise to the level of significant meaning, emotional attachment, or benefit to [R.K. and N.K.]. Losing

9

their relationship with their parents would not harm [the children] as much as it will harm their parents. However, it will also not harm [R.K. and N.K.] to the extent that it would outweigh the benefit that the security they get from the resource family benefits them. With the resource family they have created a child and parental relationship and they have bonded with the other children in the home, and severing those relationships would be more detrimental to them." The court found the children to be adoptable and terminated Mother and Father's parental rights.

Father and Mother timely appealed from the orders terminating their parental rights.[6]

## II. DISCUSSION

On appeal, both parents contend the juvenile court erred in refusing to apply the beneficial parental relationship exception.[7] The beneficial parental relationship exception allows the juvenile court to decline to terminate parental rights and to select a permanent plan for the child other than adoption in situations where the parent demonstrates, by a preponderance of the evidence, "[(1)] that the parent has regularly visited with the child, [(2)] that the child would benefit from continuing the relationship, and [(3)] that terminating the relationship would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 629-630.) "[This] exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even

---

[6] Both parents appealed the section 388 and section 366.26 orders. In his opening and reply briefs, Father only addressed the beneficial parent exception under section 366.26, and Mother joined his argument. As neither parent addressed the section 388 appeal, we conclude the parents forfeited their section 388 challenge.

[7] Mother joins Father's brief pursuant to California Rules of Court, rule 8.200(a)(5). Mother also argues that, in the absence of error as to Mother, the order terminating Mother's parental rights must be reversed if Father's is reversed because the juvenile court may not terminate the rights of only one parent unless the other parent is deceased or has relinquished their rights under California Rules of Court, rule 5.725(a). Mother contends that if Father's rights are reinstated, adoption would be unattainable, and the children should retain any benefit from Mother.

10

when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Id*. at p. 630.)

It is undisputed, and the record shows, that the parents had regular visits and contact with their children. The juvenile court concluded that the other two elements of *Caden C.* had not been met. The court highlighted the children's young ages and found that the children's interactions with their parents had been positive but did not rise to the level of significant meaning, emotional attachment, or benefit to the children. It determined that the children losing their relationship with their parents would not harm the children as much as it would harm their parents. The court also found that the children had created a child and parental relationship with their resource family and had bonded with the other children in the home, and that severing those relationships would be detrimental to them. It noted that the children sought out their resource parent for reassurance and emotional support during visits. The court determined that losing their relationship with their parents would not harm the children to the extent that it would outweigh the benefit and security they obtain from the resource family.

The parents contend that the juvenile court reviewed the parents' relationship with the children in a cursory manner when evaluating the second element and improperly focused on the benefit the children would obtain from being adopted by their resource family rather than the benefit the children would obtain from continuing their relationship with both parents. The parents maintain that because the court failed to conduct a proper analysis under the second element, it could not accurately weigh the benefits of preserving the parent-child relationship against the benefits of adoption under element three.

The Department argues that the juvenile court properly evaluated the facts and record to find no substantial positive, emotional attachment under the second element. It maintains that the court need not turn a blind eye to who the children consider to be parental figures in their lives when evaluating the circumstances under the *Caden C.*

elements. The Department further contends that the court did not need to make express findings when concluding that the beneficial relationship did not apply, as the court's finding was supported by the record, and that the emotionally charged nature of the hearing implies that the ruling did not reflect all the court's impressions. Lastly, the Department argues that the court need not reach the third element given that the parents failed to meet their burden as to element two.

We apply a "hybrid" standard to review the juvenile court's application of the beneficial parental relationship exception. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) The substantial evidence standard applies to the first two elements: that the parent has regularly visited with the child and that the child would benefit from continuing the relationship. (*Id.* at pp. 639-640.) As to the third element, we review the juvenile court's factual determinations for substantial evidence, but review the ultimate decision— whether terminating parental rights would be detrimental to the child—for abuse of discretion. (*Id*. at p. 640.) Where, as here, the juvenile court concludes that appellants did not carry the burden of proof at the hearing below, we ask " 'whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." [Citation.]' [Citation.]" (*In re S.G.* (2021) 71 Cal.App.5th 654, 671.)

A. *Parents Failed to Show a Substantial Benefit to the Children from Their Relationship*

The juvenile court found that, while the parents' relationship with the children was loving and positive, the parents had not established that the children would benefit from continuing a relationship with them. This finding is supported by substantial evidence.

To successfully show a beneficial relationship, a parent "must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) Whether continuing a relationship with the parent is in a

12

child's best interest depends on many factors: the age of the child, the portion of the child's life spent in the parent's custody, and the effect interaction with the parent has on the child. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).) Courts can "consider how children feel about, interact with, look to, or talk about their parents [citations]," and can rely on observations of others who have observed visitation to formulate conclusions. (*Caden C.*, at pp. 632-633.)

Those who observed the parents' visits with the children throughout the dependency indicated that they were "attentive," "loving", and "affectionate." Both parents engaged with the children by reading, playing, and eating snacks together. While the foregoing points to a loving and affectionate relationship with the children, the evidence is reflective of the "incidental benefit" that "[i]interaction between natural parent and child will always confer" (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575), rather than the "substantial, positive, emotional attachment to the parent" required by the exception (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) "[S]ignificant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation," a relationship that arises from "day-to-day interaction, companionship and shared experiences." (*Autumn H.*, at p. 575.) But the record does not include evidence of day-to-day interactions and shared experiences beyond those incidental to the one-to-three supervised visits per month shared between the parents and the children. R.K. has spent more than half of his life in care of his resource parents, and N.K. has never lived with her parents. Their relationship with their parents was established entirely through supervised visits, resulting in a relationship that amounts to "little more than play dates" with a loving adult. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1316-1317.)

Nor does either child have "substantial, positive, emotional attachment" to either parent. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) Neither R.K. nor N.K. showed any signs of attachment to the parents during the visits or any signs of distress at the conclusion of

a visit. Father testified that R.K. "went mute" when he initially left his parents' care but began talking again after Father repeatedly assured him that he would bring R.K. home, but then simultaneously conceded that R.K.'s speech therapy over the course of the dependency played a role in helping him talk more. Father also believed that the children were distressed when separating from him because N.K., who was a "daddy's girl," did not want to sit on his lap anymore. He then conceded that N.K. would "just kind of go and do her own thing with the letters and stuff on the board," indicative of normal growth in a toddler. Father was also sure the resource parents could attest the children acted out when they did not see their parents. The record does not support this. Both children actively sought out their resource parent at the end of their visits. R.K.'s medical evaluation prior to the six-month review settlement conference indicated that he was distressed when his resource mother was not in front of him during visits with his biological parents and that he experienced confusion between his resource parents and biological parent during visits. The evidence of the children's reactions to their parents does not support a conclusion that there was a substantial emotional attachment between them.

Father argues that the juvenile court's analysis of this factor was cursory and improperly focused on the children's relationship with the caregivers instead of the children's interactions with Father. In *In re M.V.* (2023) 87 Cal.App.5th 1155, the juvenile court acknowledged that the child wanted to remain in contact with her parents and live with both her parents and her caretakers, and that she would be sad if she could not see her parents again. (*Id.* at p. 1184.) The court also stated that there was clearly a bond with the child and parents. (*Id.* at pp. 1184-1185.) This was all it said about the benefit to the child of continuing the parental relationship before moving on to the detriment analysis. (*Id.* at p. 1185.) The court of appeal reversed, finding this analysis to be "cursory." (*Id.* at p. 1184.) The court observed that the beneficial relationship element is not, "Is there a bond?" (*Id.* at p. 1185.) The court concluded that the trial

14

court had failed to sufficiently evaluate "the quality of the parent-child relationships or to have considered factors such as M.V.'s age, how much of her life she spent in her parents' custody, the positive or negative effects of interaction with the parents, and M.V.'s particular needs. [Citation.]" (*Id.* at pp. 1184-1185.)

Here, the court's review was not cursory. It reviewed the children's attachment to the parents and found no substantial benefit. It considered the children's ages, their positive interactions with their parents, and their needs for permanency and stability. The court was not required to "recite specific findings relative to its conclusions regarding any or all of the three elements of the exception" when finding the parental-benefit exception inapplicable. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.) Substantial evidence indicates that there was no beneficial relationship. (See *Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) The children did not live with their parents for most of their lives, and their visits never progressed past supervised visitation. They did not show any signs of attachment to the parents during the visits or any signs of distress at the conclusion of a visit. Instead, both children actively sought out their resource parent at the end of their visits. Even if the juvenile court also considered the relationship with the resource parents in its evaluation of this factor, substantial evidence supports its conclusion that neither parent demonstrated a substantial benefit from continuing their relationship.

B. *Terminating the Parental Relationship Would Not Be Detrimental to the Children*

Both parents also failed to show that severing the parental relationship would be detrimental the children. In evaluating whether termination would be detrimental to the child, a court must decide whether the harm from severing the parental relationship outweighs the benefit to the child of placement in a new adoptive home. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The trial court must determine whether terminating parental rights "serves the child's best interests" by evaluating "what life would be like for the

15

child in an adoptive home without the parent in the child's life." (*Id.* at pp. 631-633.) The juvenile court may consider emotional instability and preoccupation with the parent leading to acting out, difficulties in school, insomnia, anxiety, or depression. (*Id.* at p. 633.) The court may also assess whether "a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Ibid.*) " 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights. . . . When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent. [Citation.]" (*Id.* at pp. 633-634.) The overall inquiry thus is a "subtle enterprise." (*Id*. at p. 634.)

The juvenile court here considered the children's lives without their relationship with both parents. It determined that both young children had securely bonded and attached to their resource family, and the resource family had created a child and parental relationship with the children in their home. The court concluded that severing their relationship with their parents would not outweigh the benefit and security the children obtain from their resource family, and severing their relationship with their resource parents would be more detrimental to them.

Thus here, the court properly considered the strength of the children's bonds with the parents in the context of whether each child would "be harmed, on balance, by losing it." (*Caden C.*, *supra*, 11 Cal.5th at p. 638.) As discussed above, Father's testimony that the children had trouble separating from the parents during visits was not supported by the record. Both parents presented little to no evidence that either child had such an "intense" bond with their respective parents that severing the relationship would lead to

16

trauma such as emotional instability, acting out, difficulties in school, insomnia, anxiety, or depression. (*Id.* at p. 628 [relying on expert testimony].) There is no evidence that the children suffered during the parents' absence, that the children missed either parent or had difficulties during the time that the children were not with either parent, or that either child relied on either parent for their emotional wellbeing and security. Instead, the record is clear that the children experienced distress and confusion by continuing to visit their parents and sought out their resource parent for comfort at the conclusion of visits. N.K. could only be comforted by her resource mother when crying during the visits. The Department also presented evidence that the children, who have special needs, readily bonded with their resource parents, displayed affection towards them, and relied on them for their daily and special needs. The evidence demonstrates that R.K. and N.K. were calm and happy children who were thriving in their homes with their resource family. Based on this evidence, the court correctly determined the parents failed to show that the harm from losing the parental relationship would outweigh the benefit the children obtained from their resource family.

Father contends that because the court failed to properly focus its attention on the children's relationship with him rather than their relationship with their caretakers when evaluating whether the children would benefit from continuing a relationship with him, it could not accurately weigh the benefits of preserving the parent-child relationship against the benefits of adoption. We disagree with Father's framing of the analytic framework. *Caden C.* requires that the juvenile court weigh the *harm* from severing the parental relationship against the benefit of placement in a new adoptive home. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) It does not require weighing the benefit of preserving the relationship against the benefit of the adoptive home as Father suggests. The court properly concluded at step two that the children did not obtain a substantial positive benefit from their relationship with their parents. Then at step three, the court properly

17

weighed the harm of severing the parent-child relationship against the benefits of adoption.

Because substantial evidence supports the juvenile court's factual findings, the court did not abuse its discretion in concluding that the benefits of adoption by the children's resource family of 18 months outweighed any detriment from the loss of the parental relationship.  (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

As both parents failed to establish the beneficial relationship exception, the court did not err in terminating parental rights for both parents.

### III.    DISPOSITION

The April 22, 2024, orders terminating Mother's and Father's parental rights are affirmed.

_____
Greenwood, P. J.

WE CONCUR:

_____
Grover, J.

_____
Danner, J.

H052053 - In re R.K. et al.; Santa Cruz County HSD v. D.L. et al.